IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

| | |
|---|---|
| UTAH ENVIRONMENTAL CONGRESS,<br><br>        Plaintiff,<br><br>    v.<br><br>ROBERT MacWHORTER, in his official capacity as Forest Supervisor for the Dixie National Forest; GAIL KIMBALL, Chief of the Forest Service; and UNITED STATES FOREST SERVICE,<br><br>        Defendants. | Case No. 2:08-CV-118-SA<br><br><br>**MEMORANDUM DECISION AND ORDER** |

Before the court is an action brought by Plaintiff, Utah Environmental Congress ("UEC"), seeking reversal of the approval by Defendant Robert MacWhorter of the Mt. Dutton Vegetation Management Project ("Mt. Dutton Project") on the Dixie National Forest ("DNF").  UEC claims that the approval of the Mt. Dutton Project violates the National Environmental Policy Act ("NEPA"), the National Forest Management Act ("NFMA"), and the regulations implementing those laws.

Having carefully reviewed the parties' pleadings, the law, and having heard oral arguments, the court concludes that UEC has not shown the approval of the Mt. Dutton Project was arbitrary,

capricious, an abuse of discretion, or otherwise not in accordance with law.  Accordingly, UEC's request for the court to reverse the Mt. Dutton Project's approval is denied.

## BACKGROUND

The Mt. Dutton Project area is located within the Mount Dutton Management Unit of the DNF.  (Doc. 7, the certified copy of the Administrative Record relating to the Mt. Dutton Project ("AR") 14013 (map).)  The project area consists of approximately 5,490 acres and lies approximately fifteen air miles northeast of Panguitch, Utah.  (AR 14007.)

Several years ago, the project area suffered a spruce beetle infestation that killed 90 percent of the Engelmann spruce trees that were at least six inches in diameter at breast height and 130 Engelmann spruce trees that were at least eight inches in diameter at breast height.  (AR 14034.)  Although the spruce beetle has killed the trees and moved on (AR 14051), this major loss of the large Engelmann spruce trees has caused substantial changes both inside and outside of the project area (AR 13815, 13816, 13829, 13837 (photographs)).

During the spruce beetle epidemic in 2002, a prescribed burn, known as the Sanford Fire, got out of control and burned 72,000 acres within the DNF.  (AR 12258-61, 14035.)  Approximately 29,000 of these acres were within the Mount Dutton Management Unit.  (AR 98.)  The remaining burned acres are located in the DNF's other management units (AR 3451); however,

2

the Sanford Fire did not burn any acres within the Mt. Dutton
Project area (AR 3453).  In addition to consuming vegetation, the
Sanford Fire had further impacts on water quality and soils.  For
example, the fire decreased shade over streams, which caused an
increase in water temperature (AR 14063), and the decrease in
vegetation also led to erosion, which degraded streams below the
project area.  Given the consequences of the Sanford Fire that
occurred outside of the Mt. Dutton Project area, the DNF
determined that it needed to analyze whether to remove the
substantial amount of fire fuel in the project area to reduce the
risk of a future catastrophic fire.

     In determining what action to consider to reduce the fire
danger, the DNF held public meetings and offered a public field
trip into the area to obtain public comment.  (AR 306-318,
1307-1495.)  UEC was among those who provided public comments.
(AR 1334-1488, 1492-93.)

     After receiving public comment, the DNF prepared a 102-page
Environmental Assessment ("EA") to analyze the impacts of three
alternative solutions to the fire hazard.  First, under the "no
action" alternative, the DNF would leave the project area in its
current status.  (AR 14051.)  Second, under the "proposed
action," the DNF would:  (1) harvest dead Engelmann spruce trees
on 836 acres within the project area (AR 14021); (2) authorize a
prescribed burn of approximately 296 acres to allow for new
growth (*id.*); and (3) replant Engelmann spruce trees in

                                    3

approximately 427 acres of the project area (*id.*).  Third, under

"Alternative A," the DNF would: (1) harvest dead Engelmann spruce

trees over 691 acres of the project area (*id.*); (2) authorize a

prescribed burn of approximately 288 acres (*id.*); and (3) replant

Engelmann spruce trees in 419 acres of the project area (*id.*).

The stated purpose and need for the project is to

> return the forest structure to a live forest
> where a diverse mixture of conifer and aspen
> trees occupy at least 150 live trees per acre
> . . . providing approximately 9.6 million
> board feet of salvage timber for commercial
> sale . . . reduce undesirable fuel buildup by
> a combination of post-treatment [] slash (lop
> and scatter), prescribed burning, slash pile
> burning, and burning the log landings. . . .
> [R]educe open road density from 3.42
> miles/square mile to 2.63 miles/square mile
> within the wildlife habitat effectiveness
> area[.]

(AR 13988.)

Once completed, the DNF distributed the EA for public

comment to interested parties and the local news media. (AR

14149.)  The DNF received several comments, including those from

UEC.  (AR 14137-44.)  After reviewing the comments (AR 14146), on

February 23, 2007, Defendant DNF Supervisor Robert MacWhorter

signed and issued the DNF's EA with responses to public comment

and its Decision Notice and Finding of No Significant Impact

("DN/FONSI"); however, because the Forest Service's 2005 planning

regulations, to which the DNF cited in its DN/FONSI, were

enjoined, the DNF withdrew the DN/FONSI (AR 13885).  On May 9,

2007, after the 2005 planning regulations were enjoined, the

Forest Service directed its offices to employ 36 C.F.R. §
219.35(a)(2001).  (AR 14114.)  On June 15, 2007, Kevin
Schulkoski, acting for Supervisor MacWhorter, signed the reissued
DN/FONSI and issued a revised EA.  (AR 13981-14105, 15394-402.)
UEC is challenging the second, June 15, 2007 DN/FONSI in this
action.

On August 3, 2007, UEC filed its administrative appeal of
the June 15, 2007 DN/FONSI.  (AR 14906-14951.)  On September 13,
2007, the Appeal Deciding Officer affirmed the June 15, 2007
DN/FONSI.  (AR 15394-402.)  The September 13, 2007 decision
constitutes the "final agency action" for purposes of judicial
review (AR 15394).  *See* 5 U.S.C. § 704.

On February 13, 2008, UEC filed its complaint in this case
seeking judicial review under the Administrative Procedure Act
("APA") of the Department of Agriculture's September 13, 2007
final decision, and the case was assigned to United States
Magistrate Judge Samuel Alba.[1]  (Doc. 1.)  On June 16, 2008, UEC
filed its opening brief.  (Doc. 17.)  Defendants MacWhorter, Gail
Kimball, and the United States Forest Service ("Forest Service")
(collectively "Defendants") filed a response brief on July 22,
2008.  (Doc. 25.)  On August 8, 2008, UEC filed its reply brief.
(Doc. 29.)  The parties presented oral arguments to the court on
December 5, 2008.  (Doc. 40.)

---

[1]The parties consented to presiding magistrate judge
jurisdiction on February 18 and 20, 2008.  (Doc. 4.)

On December 5, 2008, Defendants filed a Notice of
Supplemental Authority.  (Doc. 41.)  A month later, on January 7,
2009, Defendants filed an Errata.  (Doc. 44.)  On July 10, 2009,
UEC filed a Notice of Supplemental Authority (Doc. 48), which
Defendants responded to on July 15, 2009 (Doc. 49).[2]

## **STANDARD OF REVIEW**

The court reviews the Forest Service's approval of the Mt.
Dutton project as a final agency action under the APA because
neither NEPA nor NFMA provides a private right of action.  *See*
*Utah Envtl. Cong. v. Bosworth*, 443 F.3d 732, 739 (10th Cir. 2006).
Under the APA, the court must affirm the DNF's approval of the
DNF Project unless the decision was "'arbitrary, capricious, an
abuse of discretion, or otherwise not in accordance with law.'"
*Greater Yellowstone Coal. v. Flowers*, 359 F.3d 1257, 1268 (10th
Cir. 2004) (quoting *Utahns for Better Transp. v. U.S. Dep't of
Transp.*, 305 F.3d 1152, 1164 (10th Cir. 2002), *modified on reh'g*,
319 F.3d 1207 (10th Cir. 2003)); *see also* 5 U.S.C. § 706(2)(A).
This is a narrow and deferential standard, and "'the court is not
empowered to substitute its judgment for that of the agency.'"

---

[2]On July 27, 2009, UEC filed a Motion to Strike Defendants'
Response to its Notice of Supplemental Authority.  (Docs. 50,
51.)  Defendants opposed that Motion to Strike on August 11,
2009.  (Doc. 52.)  On August 24, 2009, UEC filed a stipulated
motion to withdraw its Motion to Strike and Defendants' Response
to that motion.  (Doc. 53.)  The court granted the motion to
strike on March 26, 2010.  (Doc. 55.)

*Utah Envtl. Cong. v. Bosworth*, 439 F.3d 1184, 1188 (10th Cir. 2006) (citation omitted).

Furthermore, an "agency's interpretation of its own regulations, including its procedural rules, is entitled to great deference." *Bar MK Rances v. Yuetter*, 994 F.2d 735, 738 (10th Cir. 1993). Deference to the agency is also "'strong where the challenged decisions involve technical or scientific matters within the agency's area of expertise.'" *Utah Envtl. Cong. v. Russell*, 518 F.3d 817, 824 (10th Cir. 2008) (quoting *Utah Envtl. Cong.*, 443 F.3d at 739). "The agency, not the reviewing court, is entrusted with the responsibility of considering the various modes of scientific evaluation and theory and choosing the one appropriate for the given circumstances." *Utah Envtl. Cong.*, 439 F.3d at 1188 (quotation marks and citations omitted).

"An agency's decision will be deemed 'arbitrary and capricious "if the agency . . . entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise,"'" *Utah Envtl. Cong. v. Troyer*, 479 F.3d 1269, 1280 (10th Cir. 2007) (quoting *Utah Envtl. Cong.*, 443 F.3d at 739 (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983))), "if the agency failed to base its decision on 'consideration of the

relevant factors,' or if 'there has been a clear error of
judgment' on the agency's part," *id.*

## APPLICABLE LAW

Before analyzing UEC's argument, the court reviews the
applicable law in this case.

### A.   NFMA

National forests are established and administered for
outdoor recreation, range, timber, watershed, and wildlife and
fish purposes. *See* 16 U.S.C. § 528.  The management of the
national forests is governed by NFMA, 16 U.S.C. §§ 1600-1687.
Under NFMA, the Forest Service is required to develop and
maintain forest management plans for each unit of the National
Forest system. *See* 16 U.S.C. § 1604(a).  Forest plans govern the
management of the national forests, and all uses of the national
forests must be consistent with the corresponding plans. *Id.* §
1604(i).  Consequently, the Dixie National Forest Plan ("the DNF
Plan") governs the activities within the DNF at issue in this
action.

### B.   NEPA

Where, as here, the DNF makes a project-specific decision
under the DNF Plan, the DNF also must comply with NEPA, 42 U.S.C.
§§ 4321 to 4347.  To comply with NEPA, an agency must prepare an
Environmental Impact Statement ("EIS"), an EA, or apply a
categorical exclusion. *See Utah Envtl. Cong.*, 518 F.3d at 821.

If the agency determines the proposed action will significantly affect the environment, or if substantial questions are raised as to whether the proposed action may significantly affect the environment, an EIS must be prepared.  *See McKeen v. United States Forest Service*, 615 F.3d 1244, 1248 n.3 (10th Cir. 2010). The agency must prepare an EA if an agency is uncertain whether a proposed action will significantly affect the environment.  *See Utah Envtl. Cong.*, 518 F.3d at 821.  An EA is a "concise public document" that "[b]riefly provide[s] sufficient evidence and analysis for determining whether to prepare" a more detailed EIS. 40 C.F.R. § 1508.9(1).  If the agency finds that a more detailed EIS is not required, then it must issue a FONSI, "which briefly presents the reasons why the proposed agency action will not have a significant impact on the human environment." *Utah Envtl. Cong.*, 518 F.3d at 821.  Once the agency identifies and evaluates environmental concerns, "NEPA places no further constraint on agency actions." *Silverton Snowmobile Club v. U.S. Forest Serv.*, 433 F.3d 772, 780 (10th Cir. 2006).

### C.  NFMA's Implementing Regulations

"NFMA imposes substantive duties on the Forest Service, such as the duty to 'provide for diversity of plant and animal communities.'" *Utah Envtl. Cong. v. Troyer*, 1:04-cv-155-PGC, *8 (D. Utah July 5, 2005) (quoting *Utah Envtl. Congress v. Zieroth*, 190 F. Supp. 2d 1265, 1268 (D. Utah 2002).  NFMA's implementing

regulations set forth specifically how the Forest Service will satisfy those duties.  In this case, the DNF applied the "2000 regulations."  One of the 2000 regulations' provisions requires the Forest Service to consider "the best available science in implementing" site-specific projects within a forest unit.  *See* 36 C.F.R. § 219.35(a) (2001).  One of UEC's arguments is that "the NFMA '2000 transition regulation' is illegal under the NFMA."  (Doc. 15, at 38.)  The court addresses UEC's assertion that the 2000 regulations violate NFMA in its analysis below.

## ANALYSIS

UEC makes four main arguments in challenging the September 13, 2007 decision.[3]  First, UEC makes two NEPA arguments.  UEC argues that the DNF's decision is arbitrary and capricious because (1) it failed to take a hard look at the peregrine falcon

---

[3]Throughout its brief, UEC makes passing arguments that the court refuses to address because they are inadequately briefed, and under the Federal Rules of Appellate Procedure, insufficiently briefed arguments are not considered.  *See Olenhouse v. Commodity Credit Corp.*, 42 F.3d 1560, 1580 (10th Cir. 1994) ("Reviews of agency action in the district courts must be processed *as appeals*.  In such circumstances the district court should govern itself by referring to the Federal Rules of Appellate Procedure." (emphasis in original)); *Murrell v. Shalala*, 43 F.3d 1388, 1389 n.2 (10th Cir. 1994) ("[P]erfunctory complaints [that] fail to frame and develop an issue [are not] sufficient to invoke appellate review."); *United States v. Zannino*, 895 F.2d 1, 17 (1st Cir. 1990) (noting the "settled appellate rule that issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived").  For example, UEC makes a one-sentence allegation that the DNF is violating the DNF Plan by exceeding state water quality standards, and another one-sentence allegation that the DNF is violating the DNF plan by exceeding the roads per square mile guideline.  (Doc. 15, at 18, 31-32.)

and roads in violation of NEPA, and because (2) NEPA requires the
DNF to prepare an EIS in this instance.  UEC also makes two NFMA
arguments.  UEC argues (3) that the 2000 transition regulations
are illegal under NFMA and (4) that the DNF violated NFMA by
failing to follow its forest plan as to the wild turkey, aquatic
macroinvertebrates, the northern goshawk, and the three-toed
woodpecker.

### 1.  Peregrine Falcons and Roads

The court first addresses UEC's argument that the DNF's
decision violates NEPA and thus is arbitrary and capricious
because it failed to meet its obligation to take a "hard look" at
the potential environmental consequences of the Mt. Dutton
Project in terms of peregrine falcons and roads.  For UEC to
carry its burden to overcome the presumption in favor of the
agency action, it must show the DNF's action was "arbitrary and
capricious."  5 U.S.C. § 706(2)(A).  To show the DNF's decision
was "arbitrary, and capricious, an abuse of discretion, or
otherwise not in accordance with law" UEC must show the DNF did
not take a "hard look" at the impacts of its final action.  *See,
e.g., Kleppe v. Sierra Club*, 427 U.S. 390, 410 n.21 (1976) ("The
only role for a court is to insure that the agency has taken a
'hard look' at environmental consequences.").

The "hard look" test "imposes no 'substantive limits on
agency conduct.'  'Rather, once environmental concerns are
adequately identified and evaluated by the agency, NEPA places no

11

further constraint on agency actions.'"  *Silverton Snowmobile Club*, 433 F.3d at 780.  Documents prepared as part of NEPA's "hard look" requirement "'must not only reflect the agency's thoughtful and probing reflection of the possible impacts associated with the proposed project, but also provide a reviewing court with the necessary factual specificity to conduct its review.'" *Id.* at 781 (citing *Committee to Pres. Boomer Lake Park v. Department of Transp.*, 4 F.3d 1543, 1553 (10th Cir. 1993)).  Where identifying and evaluating the impacts of an action involves technical or scientific matters within the agency's area of expertise, the court "must defer to the agency's expertise." *Center for Native Ecosystems v. Cables*, 509 F.3d 1310, 1327 (10th Cir. 2007) (citing *Wyoming v. United States*, 279 F.3d 1214, 1240 (10th Cir. 2002)).

### a.  Peregrine Falcons

Defendants argue the DNF took a hard look at the Mt. Dutton Project's impacts on the peregrine falcon by identifying two types of peregrine falcon habitat - (1) nesting habitat and (2) foraging habitat  (AR 6258, 14041) - then evaluating the proposed action's impacts based on each type of habitat.  First, after conducting field reviews, the DNF determined that no suitable nesting habitat exists within the treatment area because the only rock cliffs suitable for falcon nests were one-half mile outside of the project area.  (AR 6258; Doc. 54, at 2.)  Based on that determination, the DNF decided not to analyze the proposed

action's impacts on peregrine falcon nesting habitat.  (AR
14041.)  Second, the EA provides that "[h]igh quality peregrine
falcon foraging habitat is available in the riparian areas
available along perennial stream corridors and wetlands located
within the project area."  (AR 14041.)  The DNF then assessed the
long-term effects of the proposed action.  It concluded the
proposed action actually will improve the peregrine falcon's
foraging habitat by replacing dead Engelmann spruce trees, which
no longer support the falcon's prey base, with live Engelmann
spruce trees, which will provide cover and food for the prey
base.  (AR 14072, 6288.)

     UEC counters by arguing that sheer cliffs, which allegedly
are suitable peregrine falcon nesting habitat, actually lie
within the treatment area.  UEC argues the DNF's erroneous
determination that no suitable nesting habitat led to the DNF's
decision not to conduct an impacts analysis for peregrine falcon
resources.  UEC supports its argument that suitable nesting
habitat exists within the treatment area with photos showing
cliffs UEC represents are suitable nesting habitat for peregrine
falcons.  UEC represents that those cliffs are adjacent to Forest
Road #125, a major log haul road that will carry loud trucks
loaded with Mt. Dutton timber.  UEC argues that smoke, noise, and
dust will indirectly adversely affect peregrine falcons by
affecting the cliffs shown in the submitted photos.  Based on
this argument, UEC argues the Forest Service's approval of the

Mt. Dutton Project is arbitrary and capricious because it is based on factual inaccuracies.

Defendants respond by arguing UEC's submitted pictures are not enough to show that suitable nesting habitat exists within the treatment area.  Defendants argue the DNF determined the closest suitable nesting habitat lies one-half of a mile outside the treatment area boundary (AR 6258), and the DNF's determination of the project boundary governs all future actions, see Kleppe, 427 U.S. at 414 (stating that agencies have discretion to determine the physical boundaries for project impacts).  Further, this court is to give great deference to the DNF's determination of where suitable nesting habitat exists.

Having carefully considered UEC's argument, the court concludes it need not determine whether cliffs that are suitable peregrine falcon nesting habitat lie within the treatment area because even were the court to assume that the cliffs lie within the treatment area, the court concludes UEC has not shown the DNF did not take a "hard look" at the project's impact on the peregrine falcon.  The Forest Service's ground surveys revealed that the nearest falcon nest is 24 miles outside the treatment area (AR 6258), and nothing has been submitted in the record showing there are peregrine falcons any closer than that 24-mile distance.  (Tr. 26.)  Because the nearest identified falcon is 24 miles outside the area at issue, and because peregrine falcons nest high on the sheer rock cliffs, on which no Engelmann spruce

14

trees can grow, the Engelmann spruce trees will not be harvested, burned, or planted on the cliffs on which peregrine falcons nest, and no identified peregrine falcon will be directly affected by the proposed project.

Without disputing that the record shows no peregrine falcons have been found within the project area, UEC nevertheless argues the project will result in negative indirect impacts to the alleged nesting habitat (rock cliffs) because some of the activities will cause smoke, noise, and dust (Tr. 9-10, 38); however, other than making general, broad assertions, UEC has not specified how smoke, noise, and dust will affect the sheer rock cliffs in a way that is significant to peregrine falcons.  At oral argument, UEC asserted: "I do think sound affects rock.  I think smoke affects rock.  I think dust affects rock.  I think that in and of itself is just common sense."  (Tr. 38.)  This argument does not explain to the court how sound, smoke, and dust affect the peregrine falcon's nesting habitat; it simply assertively insists that it does affect it.

Additionally, the EA addresses what would happen if a peregrine falcon were to enter the treatment area during the project activity.  The EA acknowledges the falcon would be temporarily affected by the smoke, dust, and noise, but that the habitat would not be permanently affected.  (AR 6288; Tr. 28.) UEC has not shown how the indirect impacts of the project on the rock cliffs will harm the peregrine falcon beyond the temporary

15

effects the EA contemplates were a peregrine falcon to enter the area during the project.

Thus, the EA identifies and evaluates legitimate, rational concerns regarding the peregrine falcon; UEC has not shown the DNF failed to take a "hard look" at how the Mt. Dutton Project may affect the peregrine falcon.

As part of its argument, UEC argues that the NEPA requirement that agencies insure professional and scientific integrity in their environmental documents was not followed in this instance and that the DNF purposefully misled the public. *See* 40 C.F.R. § 1502.24. "[G]overnment officials are presumed to act in good faith, and 'it requires "well-nigh irrefragable proof" to induce the court to abandon the presumption of good faith[.]'" *T&M Distribs., Inc. v. United States*, 185 F.3d 1279, 1285 (Fed. Cir. 1999) (citations omitted). Although UEC presented the court with photographs of cliffs purportedly of suitable peregrine falcon nesting habitat that purportedly were taken within the treatment area, these photographs are not enough to prove that government officials acted without integrity. Without more, UEC does not overcome the strong presumption that government officials acted in good faith.

### 2. Roads

Second, UEC argues the DNF violated NEPA in the way it analyzed the impact of roads in its report. Defendants argue the DNF did not violate NEPA, but instead took a hard look at roads

16

in the Mt. Dutton Project by identifying their environmental impacts and evaluating them.

Defendants point out that the DNF identified 30.65 miles of forest roads and 7.15 miles of unauthorized roads within the project area (AR 14036), and determined that the existing open roads impacted the environment in several ways. In addition to causing temporary soil instability, which has become stable over time (AR 14067, 6082), the DNF determined that the existing roads: (1) fragment wildlife habitat (AR 279-80); (2) affect elk calving and deer fawning during the spring and summer months (AR 14009, 14043); (3) limit the amount of escape cover on which big game animals rely (AR 14043); and (4) impact the health of streams and aquatic biota due to sedimentation, and increase the possibility that damaging chemicals from vehicles will enter the environment (AR 14077, 281). The DNF's proposed action (1) closes 12.79 miles of existing roads to public motorized use and (2) decommissions 3.24 miles of existing roads, which terminates their use as roads for any purpose (AR 14019). The DNF determined it would close roads with earth/rock barriers and seed with native vegetation (AR 14019), and that reducing motorized access together with the new vegetation would reduce erosion and sedimentation and return the road to a natural-looking landscape (AR 6084, 14084). The DNF also determined that road closures and vegetation seeding minimize habitat fragmentation for wildlife, reduce the likelihood of adversely affecting elk calving and deer

17

fawning, and allow big game to have the necessary escape and hiding cover. (AR 14075, 6252, 6263, 6279, 6299.) The DNF determined that the road closures would limit the opportunities currently available to off-highway vehicles, which are known to cause impacts to both soil and wildlife (AF 14081, 6252), and that these road closures would benefit the goshawk, its prey, the three-toed woodpecker, and the northern flicker because their habitat would be less accessible to people (AR 6293, 6296, 6300-01, 6316).

UEC accuses the DNF of presenting its decision in an inaccurate and falsely favorable light by including roads within the road decommissioning numbers that are nonexistent or that had already been decommissioned so long ago that they appear to be nonexistent. UEC has submitted pictures of some of these nonexistent roads, showing that they have completely or for the most part returned to their natural state. UEC argues "[t]he analysis of the impacts to soils is premised on falsely presented beneficial impacts from decommissioning portions of roads that, in effect, do not exist, and which artificially inflate the actual road density reduction. The [DNF]'s reliance on decommissioning non-existent roads is arbitrary and capricious and violates both the letter and the spirit of NEPA." (Doc. 15, at 20.) UEC argues that road decommissioning is defined by 36 C.F.R. § 212.1, as "[a]ctivities that result in the stabilization and restoration of unneeded roads to a more natural state."

Because some of the segments of decommissioned roads have already returned to their natural state, UEC argues that no activity is needed to accomplish that objective, and thus the roads do not need to be decommissioned and should not be included as such in the report.

The court has carefully examined UEC's argument and finds it unpersuasive.  The definition of "decommission" used by the DNF in its report is that found on the Forest Service's Website, which states that to decommission, in part, means the "terminat[ion] of a facility's function as a road."  Washington Office Engineering at the USDA Forest Service, Transportation: Road Decommissioning, *available at* http://www.fs.fed.us/eng/transp/decomm.htm (last visited September 23, 2009).  In other words, the DNF expressly defined road decommissioning in its report as closing access to roads. By listing its definition of "decommission" on its website, the Forest Service has made public what it means by "decommission" in its reports.

In addition, even though some of the roads that were "decommissioned" apparently had already returned to their natural state, the DNF was still taking some action that would result in the stabilization of unneeded roads to a natural state by officially decommissioning them, officially prohibiting use of those roads.  (AR 15397.)  As Defendants have explained to the court, technically, without a formal, administrative decision

19

closing those roads, the public, the government, and other forest users would be free to use motor vehicles on those naturally decommissioned roads, causing harm to soil and vegetation.[4] (Doc. 25, at 19-20.)  Furthermore, the DNF compiled information showing that some of the 3.24 miles of road proposed for decommissioning already was healing itself naturally.  (AR 294-98.)  In its Roads Analysis Report, the DNF presented a lengthy table in which it listed each segment of road within the project area and its designated use, including several small road segments listed as decommissioning "naturally."  (*Id.*)  More than one year before the DNF issued its DN/FONSI, the DNF made the Roads Analysis Report available to the public.  (AR 14011.)  The EA itself cites the Roads Analysis report.  (AR 14011, 14105.)

Additionally, and very significantly, UEC does not even mention the additional 12.79 miles of road the DNF closed to public motorized access.  UEC does not dispute that such closure will have beneficial impacts in terms of reducing soil surface disturbance.

NEPA analysis may be insufficient if the agency (1) "did not make a reasonably adequate compilation of relevant information" and (2) made "materially false or inaccurate" statements.  *Sierra*

---

[4]In fact, Defendants pointed out to the court during oral arguments that one of UEC's blown-up photographs of one of the disputed decommissioned roads shows tire treads, illustrating that an OHV probably recently had used the overgrown road.  (Tr. 34.)

*Club v. U.S. Army Corps of Eng'rs*, 701 F.2d 1011, 1030 (2d Cir. 1983).  Here, however, the DNF defined "decommission," compiled relevant information showing that some of the road segments were naturally repairing themselves, and disclosed that information to the public.  The DNF identified forest roads and unauthorized roads within the project area, determined how existing roads impacted the environment in several specific ways, and closed 12.79 miles of existing roads in addition to the disputed decommissioning of roads.  UEC has neither shown the DNF did not take a "hard look" at roads, nor overcome the strong presumption that the DNF's roads analysis was made in good faith.

## 2.   Environmental Impact Statement (Cumulative Impacts)

The court next turns to UEC's other NEPA argument.  UEC argues that the DNF's decision is arbitrary and capricious because the DNF should have prepared an EIS rather than preparing an EA then issuing a DN/FONSI.

As explained above, under NEPA, when an agency is unsure whether its proposed action will have significant impacts on the environment, it may prepare an EA.  *See Utah Envtl. Congress*, 518 F.3d at 821.  An EA must provide sufficient evidence and analysis for determining whether there will be significant impacts.  If the EA demonstrates that the proposed project will not cause any significant effects on the environment, it may issue a FONSI. *See id.*  If the agency determines, either from the start or after

21

an EA has been prepared, that the proposed project will cause significant effects on the environment, or if substantial questions are raised whether the proposed action may have a significant effect on the environment, an EIS must be prepared. *See McKeen*, 615 F.3d at 1248 n.3.

"A presumption of validity attaches to the agency action and the burden of proof rests with the appellants who challenge such action." *Citizens' Comm. to Save Our Canyons v. Krueger*, 513 F.3d 1169, 1176 (10th Cir. 2008). Where, as here, UEC argues that the DNF should have prepared an EIS, UEC can overcome the presumption in favor of the DNF only if UEC shows "the agency acted arbitrarily and capriciously in concluding that the proposed action will not have a significant effect on the human environment." *Greater Yellowstone Coal.*, 359 F.3d at 1274 (quotations and citations omitted). Specifically, UEC must "demonstrate substantively" that the agency's conclusion "represents a 'clear error of judgment' . . . ." *Id.* To find "clear error," UEC must show that the decision is "simply not plausible or permissible in light of the entire record," *United States v. McClatchey*, 316 F.3d 1122, 1128 (10th Cir. 2003), remembering that "[a]n agency's decision to issue a FONSI and not prepare an EIS is a factual determination which implicates agency expertise," *Greater Yellowstone* Coal., 359 F.3d at 1274 (quotation marks and citations omitted), and this court "must

defer to the agency's expertise," *Center for Native Ecosystems*,
509 F.3d at 1327.

Agencies must prepare an EIS for any "major Federal actio[n]
significantly affecting the quality of the human environment."
42 U.S.C. § 4332(C).  "In determining whether an action will
significantly affect the environment, agencies must consider both
the context in which the action will take place and the intensity
of its impact."  *Greater Yellowstone* Coal., 359 F.3d at 1274.  To
determine context and intensity, the agency considers ten
factors.  *See* 40 C.F.R. § 1508.27.  In this action, although UEC
mentions several of those factors (Doc. 15, at 24-25), it only
develops an argument regarding one of those factors:  cumulative
impacts.[5]

The term "cumulative impact" means "the impact on the
environment which results from the incremental impact of the
action when added to other past, present, and reasonably
foreseeable future actions."  40 C.F.R. § 1508.7.  "Cumulative
impacts can result from individually minor but collectively
significant actions taking place over a period of time."  *Id.*

---

[5]The court does not address any of the other factors
mentioned by UEC because they are insufficiently briefed.  *See*
*Murrell*, 43 F.3d at 1389 n.2.  For example, the court declines to
address any intended argument of bias and uncertainty; UEC
alleges but fails to adequately brief its argument that the DNF's
"decision [was] biased by stated beneficial impacts of the
project[,] . . . there is indeed an ecologically critical area
that will be impacted by the project [,] . . . [and] there are
effects on the environment that are highly uncertain . . . ."
(Doc. 17, at 24.)

NEPA requires the agency to take a hard look at the cumulative impacts on the affected geographic area.  *See Grand Canyon Trust v. Federal Aviation Admin.*, 290 F.3d 339, 342 (D.C. Cir. 2002).

UEC argues that if the DNF had done a proper cumulative impacts analysis, it would have found that the Mt. Dutton Project had a significant impact on the environment necessitating an EIS. UEC contends that the DNF's analysis was insufficient and should have required the preparation of an EIS because the DNF's cumulative impact areas for soils, watersheds, and aquatic species were inadequate.  UEC also argues the DNF failed to consider the cumulative impacts on soils, watersheds, and aquatic species.

### a.  Cumulative Impact Areas

First, UEC argues the DNF improperly determined the cumulative impact areas for soil, watersheds, and aquatic species.  The court must give great deference to the agency's designation of the analysis area for its review of cumulative impacts.  *See Neighbors of Cuddy Mtn. v. Alexander*, 303 F.3d 1059, 1071 (9th Cir. 2002) ("[U]nder NEPA we defer to an agency's determination of the scope of its cumulative effects review." (citing *Kleppe*, 427 U.S. at 413-14)).

Regarding soils, the DNF designated the project area as the cumulative impacts area for soils.  (AR 14068.)  The DNF reasoned that since harvesting, prescribed burns, and replanting activities will occur only within the project area, soil outside

24

of the project area will not be disturbed by the proposed
action's activities, and need not be analyzed.  (AR 6085.)
Regarding the watershed area, the DNF designated the cumulative
impacts area to include Hoodle Creek, Forest Creek, and Deep
Creek.  (AR 14064-65.)  The DNF chose this area because it
determined that disturbed soil and ash from the project area may
enter waters within the project area, will flow downstream out of
the project area, but will not significantly impact downstream
waters and wildlife.  (AR 3525, 14037, 14064-5.)  As a result,
the DNF included those three watersheds that are downstream from
the project area to evaluate cumulative impacts.  Regarding
aquatic species, the DNF determined that the cumulative impact
effects area included the entire watersheds of Deep Creek, Forest
Creek, and the East Fork Sevier River Outlet.  (AR 14078.)
According to the DNF's Plan, the DNF must evaluate impacts on
fish populations; but if fish data is not available, it must
evaluate impacts on aquatic macroinvertebrate species.  (AR
3521.)  Although there are no fish within the project area, the
DNF analyzed the impacts on the nearest fish population, which
lives eight miles downstream from the project area (AR 3525-26),
as well as collecting macroinvertebrate data both inside and
outside of the project area (AR 3522).  The DNF made its
determination of the aquatic species cumulative impacts area
based on that collected information.

UEC argues the project area is too small of a cumulative impacts area for soils, and that by choosing such a small boundary, the conclusion of "no measurable cumulative effects" to the soils does not account for the project's direct, indirect, and cumulative impacts that will occur in areas outside the project area.  On the other hand, UEC argues that the DNF's cumulative impact area is too large for examining the impact on the watersheds and improperly dilutes the project's negative impacts because it includes Hoodle Creek, which is part of the Sevier River Outlet.  Thus, UEC argues the impacts analysis area is too small for measuring the impacts to soils, but too large to properly measure the impacts to watersheds.  Regarding the aquatic species cumulative impacts area, UEC argues that the area should not be confined solely to the project area.

The DNF's designations are based on information gathered and analyses done of that information.  As to UEC's watershed cumulative impacts argument, the DNF's determination that the Hoodle Creek portion of the Sevier River Outlet is hydrologically connected to the project area is a matter of scientific expertise that is entitled to judicial deference.  *See Center for Native Ecosystems*, 509 F.3d at 1327 (stating that courts "must defer to the agency's expertise").  Further, UEC's argument that the sixth field watershed is in reality three sixth field watersheds - that a proper watershed designation was not made - is not an issue for which any expert showing has been made in the record.  (Tr. 30.)

26

The record reveals that the DNF's determinations of the cumulative effects areas are reasonable, are based on data and expertise, and are entitled to deference.  UEC has not overcome its burden to show the DNF did not comply with NEPA's requirements; therefore, the court must defer to the Forest Service's reasonable determinations regarding "technical or scientific matters within the agency's area of expertise."  *Utah Envtl. Congress*, 443 F.3d at 739.

### b.  Soils

Second, UEC argues the DNF failed to properly analyze the cumulative impacts on soils caused by the proposed project.

UEC claims that the detrimental soil disturbance within Hoodle Creek, Deep Creek, and Forest Creek are already at 8-15 percent and, therefore, any further detrimental soil disturbance from the proposed action will exceed the threshold value of 15 percent.  (Doc. 15, at 20-21, 29.)  In support of this argument, UEC relies on the following sentence in the Administrative Record:  "The range of threshold values varies with each watershed and region from as low as 8 percent to as high as 15 percent."  (AR 4065, 14066.)  From its argument, it appears that UEC believes that the term "threshold value" means the amount of pre-existing detrimental soil disturbance in a given area.

UEC's argument is based on an erroneous understanding of the definition of "threshold value," and consequently lacks merit. As Defendants explain, "threshold value" represents the level of

soil disturbance in an area that, if exceeded, will create a "detrimentally disturbed" soil condition (AR 6128); "threshold value" does *not* represent an existing level of soil disturbance. The DNF determined that if the threshold value of detrimentally disturbed soil exceeds 15 percent in a watershed, the area is detrimentally disturbed, and the entire area fails the DNF's soils standards.  (AR 6128, 14065-66.)  For that reason, the DNF mathematically calculated the combined amount of detrimental soil disturbance from past, present, and the proposed actions and found that the threshold values for soil disturbance in the watersheds within the project area is nowhere near 15 percent. (AR 4065, 4099-116.)

Further, the record supports that the DNF took a "hard look" at the cumulative impacts on soils.  For example, in accordance with NEPA's regulations, the DNF determined that past timber sales, grazing, roads, trails, camping, OHV use, and prescribed burns all have disturbed soils in the past (AR 14067); however, the DNF found that soil disturbances from these past activities have stabilized and now are minimal (AR 14067).  As mentioned above, the DNF mathematically calculated the extent of soil disturbance from each of the past activities.  (AR 4099-116.)

The DNF also analyzed the soil impacts from the proposed action.  First, the DNF identified the soil types within the project area.  (AR 4060-61, 6080-81, 14037.)  Second, the DNF conducted a review of the Forest Service Handbook, scientific

28

literature, and field studies to determine the threshold value
for soil quality for the activity areas within the project's
boundaries.  (AR 4183-206, 4207-11, 6129-30, 6085-86, 6243,
14064-65.)  Third, the DNF concluded that a threshold value of 15
percent was acceptable in each activity area within the project
boundaries (AR 14065-66); in other words, 85 percent of the soils
in each activity area cannot be detrimentally disturbed (AR
6128).

　　　Next, after establishing that 85 percent of the soils in
each activity area should not be detrimentally disturbed, the DNF
identified and evaluated the impacts of timber harvesting
activities and the management practices necessary to maintain the
85 percent standard.  Through field surveys and scientific
literature reviews, the DNF determined that timber-harvesting
activities can degrade soil by increasing soil compaction and
displacement, as well as decrease vegetation productivity and
microbial organisms.  (AR 6125-26.)  To mitigate these impacts,
the DNF evaluated the best management practices for timber
harvesting and found that regulating the use of ground-based
yarding systems in the DNF is likely to cause only a 7 percent
detrimental change to soils in areas where yarding is allowed.
(AR 14065.)  Also, the DNF required that helicopters harvest 278
of the 836 acres authorized for logging, which reduces the amount
of soil disturbance.  (AR 14016.)  Further, as to prescribed
burns, the DNF determined that: (1) prescribed burns would

detrimentally disturb only 5 percent of the area in which prescribed burns are allowed (AR 14065) and (2) constructing handlines by digging a shallow trench less than 24-inches wide would not detrimentally disturb the soil because the handlines would be rehabilitated following the prescribed burn.  (AR 14017.)  The DNF determined that closing and decommissioning roads would also contribute to reducing the impacts to soils. (AR 14066-68.)  The DNF then mathematically calculated the area of detrimental disturbance from the timber harvest and prescribed burn activities.  (AR 4099-116.)

Since the reasonably foreseeable future actions did not differ from the present actions currently occurring on the DNF (AR 14066-68), the DNF combined its mathematical calculations of detrimental soil disturbance from past activities, present activities, and the proposed action and determined that the total soil disturbance was less than 15 percent in each activity area. (AR 14067, 4065, 4099-116.)

In summary, UEC's argument challenging the DNF's "hard look" at the cumulative impacts on soils was based on a misunderstanding of the term "threshold value" and lacks merit. Based on the record, the court concludes the DNF took a "hard look" at the cumulative impacts on soils and appropriately determined they were not significant.

### c.  Watersheds

Third, the court examines UEC's argument that the DNF did not appropriately examine the cumulative impacts of the proposed project on watersheds.  UEC particularly argues the DNF did not consider the effects of the Sanford Fire in examining the cumulative impacts on watersheds.  Having reviewed UEC's argument and the record, the court concludes UEC's argument fails because the DNF took a "hard look" at past, present, and reasonably foreseeable future actions on watersheds and appropriately determined that those impacts are not significant.

First, the DNF looked at past actions that have impacted watersheds, including the Sanford Fire.  (AR 4063, 14063-65.)  In fact, the DNF determined that the Sanford Fire: (1) initially caused instability in stream beds; (2) placed sediment and ash, which contained phosphorous, into the water; and (3) reduced vegetative shade cover over streams, which increased water temperature in derogation of water quality standards.  (AR 4060, 4062.)  The DNF found that since the Sanford Fire in 2002, stream beds have regained stability.[6]  (AR 4060.)

Second, the DNF identified and evaluated the impacts from the proposed action.  As for the timber-harvesting portion of the proposed action, the DNF recognized that timber-harvesting

---

[6]UEC frequently asserts in its pleadings that the DNF failed to consider the effects of the Sanford Fire in analyzing the Mt. Dutton Project.  As illustrated by the court's analysis, that assertion is not supported by the record.

activities may result in erosion, which causes sediment to enter
the streams (AR 14076); however, the DNF determined that the
soils are less than 15 percent detrimentally-disturbed in all
three watersheds in the project area; thus, erosion will be
sufficiently controlled to avoid any significant impacts to water
quality (AR 14065-66).  The DNF also has prohibited land-based
mechanical timber-harvesting within 150 feet of streams (AR
14022), and only helicopter and manual harvesting are allowed
therein (*id.*), avoiding soil compaction near streams and
displacement of sediment into the waters.  Further, the DNF
recognized that removing dead Engelmann spruce trees by
non-mechanical means next to the streams will not have an adverse
effect on water quality because the dead spruce trees do not
currently shade the water.[7]  (AR 4067, 14064.)  As for the
prescribed-burn portion of the proposed action, the DNF
recognized that ash, which contains phosphorous, may enter the
streams; however, to mitigate against that impact, the DNF has
established a 100-foot vegetative buffer strip between the

---

[7]Among other assertions, citing to AR 25, 27, 3523, 3525,
3527-28, 4065, 14063, and 14076-77, UEC argues that the Mt.
Dutton Project will cause "a loss of stream shading" and "an
increase in water temperature." (Doc. 29, at 14.)  The court has
carefully reviewed these parts of the AR, but has not found
support for these assertions.
     Throughout its pleadings, UEC - as here - makes general
assertions that are not supported by the record.  Further, as
here, UEC does not explain how the alleged harm will occur, but
simply states that it will happen.  In light of the applicable
standard of review, such argument is not enough to meet UEC's
burden before the court.

prescribed burn and the stream to prevent ash and phosphorous from entering the water (AR 14022, 14063, 14076).[8]

Third, after analyzing the impacts of the Sanford Fire, other past actions, and the proposed action, the DNF evaluated the impacts of the future DNF "Motorized Travel Plan."  When evaluating the future impacts from a future decision, certainty is not required because "[c]ertainty as to the cumulative effects . . . requires prophecy beyond the capabilities of both scientists and courts.  Neither are endowed with divine inspiration.  It is enough that the [EA] mentions and discusses foreseeable problems." *Manygoats v. Kleppe*, 558 F.2d 556, 560-61 (10th Cir. 1977).  The EA mentions that the DNF's Travel Plan will designate some open travel routes in the DNF and will eliminate all other overland travel across the DNF.  (AR 14077.) The EA states that eliminating overland routes will enhance vegetation near streams and will mitigate stream-channel modification.  (AR 14077-78.)  Beyond this statement, the DNF could not discuss any further effects from the Travel Plan

---

[8]In its reply brief, citing to Judge Kimball's *Zieroth* case, *see Utah Envtl. Cong. v. Zieroth*, 190 F. Supp. 2d 1265 (D. Utah 2002), UEC argues that the mere fact that mitigation measures are being made indicates that impermissible harm is going to occur in this case.  The court has examined *Zieroth* and concludes the mitigation measures that admit harm discussed are different than those addressed in this case.  In this case, the DNF is not instituting mitigation measures to counteract harm; instead, it is taking measures to construct the project in a way so it will not interfere with the streams in the first place.

because the DNF has not yet prepared an EA or an EIS analyzing alternatives for the proposed Travel Plan.  (*Id.*)

After analyzing the past, present, proposed, and reasonably foreseeable future actions, the DNF determined that their combined impact was not significant on watersheds because detrimentally-disturbed soil will fall below 15 percent in each watershed, prescribed burns will be kept 100 feet away from the streams, and mechanized timber harvesting will be kept 150 feet away from streams.  (AR 14022, 14065-68.)  Therefore, the DNF took a hard look at the cumulative impacts on watersheds and appropriately determined that they were not significant.

### d.  Aquatic Species

Finally, UEC argues that the DNF failed to take a "hard look" at the cumulative impacts of the proposed project on aquatic species.  UEC argues that the Sanford Fire had lethal effects on much of the aquatic population and that the record lacks analysis of how Mt. Dutton Project activities, coupled with the Sanford Fire's impacts, will affect the continued substandard and downward trend on aquatic species, and macroinvertebrates in particular.[9]

Having reviewed the parties' pleadings and the record, the court is persuaded the DNF adequately considered the cumulative impacts of the Mt. Dutton Project on aquatic species.  The DNF

---

[9]UEC conceded at oral argument that within the project area, there are no fish in any of the streams or watersheds.  (Tr. 13.)

identified and analyzed four past actions that affect aquatic
species:  (1) past timber harvests; (2) livestock grazing; (3)
the Sanford Fire; and (4) roads and trails.  (AR 3527.)  The DNF
found that sediment deposition was the main effect of past timber
harvests.  The DNF also stated that further impacts from past
timber-harvest activities were difficult to discern because the
impacts of livestock grazing, roads, and post-fire effects were
more immediately pervasive.  (AR 3527-28, 14077.)  Livestock
grazing, roads, and past fires are causing sediment deposition in
the streams, and past fires also have caused a loss in shade
cover for the streams, which has increased the water temperature.
(AR 3527-28.)

The DNF also identified the present actions affecting
aquatic biota as:  livestock grazing, roads, and the proposed
action's activities (AR 14077); however, the DNF recognized these
present actions will not affect fish for two reasons: (1) the
nearest fish population is 8 miles downstream from the project
area (AR 3525) and (2) the DNF determined that there is a lack of
perennial channel connections between the project area and the
downstream fish populations (*id.*).  Further, the DNF recognized
that the proposed timber-harvesting activities may cause
increased erosion into streams, which can adversely affect
aquatic biota (*id.*); however, the DNF has prohibited land-based,
mechanized timber harvesting activities within 150 feet of

35

streams (AR 14022), minimizing erosion into streams from present timber harvesting.

In addition, the DNF identified loss of stream shading as a potential impact from the non-mechanized timber harvesting along stream banks (AR 3525); nevertheless, the DNF determined that because the dead Engelmann spruce trees that will be harvested do not currently provide any appreciable shade to the streams, harvesting the dead trees will not cause any additional impacts to stream temperature or aquatic species (AR 4067, 14064). Additionally, although the DNF identified that prescribed burn areas can add ash and phosphorous to the streams, which impact aquatic biota (AR 3525), the DNF prohibited prescribed burn activities within 100 feet of streams (AR 14022, 14063, 14076), greatly minimizing the impacts of any ash and phosphorous. Furthermore, the DNF also analyzed the impacts on the aquatic habitat of closing 12.79 miles of roads to motorized public access and decommissioning 3.24 miles of roads from all use.  The DNF determined that "[c]losure of road segments within the project area would reduce sediment production, and would promote quality aquatic habitat conditions."  (AR 3527, 14077.)

Besides analyzing the above-mentioned past and present impacts, the DNF identified and analyzed the reasonably foreseeable impacts from the DNF's future Travel Plan.  (AR 14077-78.)  The Travel Plan will open certain roads within the DNF and close all others to overland use.  (AR 14077.)  Even

36

though the DNF has neither determined alternatives nor conducted
NEPA analysis on the Travel Plan, the DNF has concluded that
closing routes through the DNF will benefit the habitat of
aquatic species by reducing sediment deposition and habitat
fragmentation.  (AR 14077-78.)  The DNF took a "hard look" at the
past, present, and reasonably foreseeable future actions on
aquatic species and appropriately determined those impacts were
not significant.

Finally, UEC asserts that the "Forest's own literature on
the effects of even small, low-intensity burns shows that the
impact can 'temporarily alter . . . the rearing areas for aquatic
macroinvertebrates.  Cumulatively, this impact could be severe.'"
(Doc. 15, at 45 (citing AR 3726).)  The court is unpersuaded by
this argument.  Page 3726, to which UEC cites, merely summarizes
a literature review on the possible effects of fire on aquatic
macroinvertebrates in the southwestern United States.  This
literature review did not conduct a site-specific analysis on
macroinvertebrates within the project area and did not consider
100-foot stream buffers like those imposed in the proposed
action, making UEC's citation to page 3726 unhelpful in
determining the cumulative impacts in the project area.  UEC has
not shown the DNF's decision was "'simply not plausible or
permissible in light of the entire record,'" *McClatchey*, 316 F.3d
at 1128 (citation omitted); therefore, UEC has not shown the DNF

37

clearly erred by deciding not to prepare an EIS or that the decision was arbitrarily or capriciously made.

### 3.  NFMA's "2000 Transition Regulation"

The court next turns to UEC's two NFMA arguments.  The court first examines UEC's argument that "the NFMA '2000 transition regulation' is illegal under the NFMA." (Doc. 15, at 38.)

Before addressing the substance of UEC's argument, the court must first examine UEC and Defendants' dispute regarding what argument UEC presented in its opening brief.  In its opening brief, UEC's entire one-paragraph argument regarding the "2000 transition regulation" was the following:

> Even if this Court finds that the DNF applied the 2000 transitional regulation to the Mt. Dutton project decision, [UEC] argues that the 2000 transition provision is illegal and cannot be applied.  The NFMA requires that the Secretary of Agriculture "shall" promulgate regulations with substantive standards and guidelines including specific "required provisions." 16 U.S.C. § 1604(c). This list includes setting regulatory standards and guidelines that ensure protection of wildlife and fish, water quality, soil quality, timber, range, wilderness, diversity of species, and monitoring and assessment.  *Id.* at § 1604(c)-(g).  The 2000 transition provision provides none of these.  Its sole requirement is that "the responsible official [must] consider the best available science in implementing" a forest plan.  36 C.F.R § 219.35(a), (d) (2001); 65 Fed. Reg. 67,514, 67,579 (Nov. 9 2002).  The transition provision entirely failed to incorporate anything that the NFMA required of its implementing regulations, and should be found illegal as a violation of NFMA.

(Doc. 15, at 38-39 (footnote omitted).)   UEC also attached the
following footnote to its argument:

> Had the transition regulation been just
> that – a stop-gap measure – it might have
> been understandable to have a stripped down
> transition regulation for a very short period
> of time.  However, the so-called transition
> regulation was in effect from 2001 when the
> Forest Service removed all substantive
> provisions of the 2000 regulations, leaving
> only the transition regulation until 2008
> when new NFMA regulations were approved.
> During those seven years all that remained to
> guide Forest Service projects across the
> country was the anemic transition regulation.

(Doc. 17, at 39 n.11.)

Defendants interpreted UEC's argument as challenging the
part of the regulation that requires that "the responsible
official [must] consider the best available science in
*implementing*" a forest plan.  (Doc. 25, at 31-32.)  Defendants
argued that the statute governing rules implementing the Forest
Plan is not section 1604, but rather section 1613, which gives
the Secretary discretion to set rules in contexts other than the
formation or amendment of a forest plan.  In its reply brief, UEC
responded by arguing "Defendants misconstrue UEC's claim as
challenging only a portion of the transition provision.  UEC
challenges the entire provision at 36 C.F.R. § 219.35 (2001)."
(Doc. 29, at 19 n.8.)  Defendants then asserted at oral argument
that the court should not consider UEC's new "facial challenge"
to 36 C.F.R. § 219.35 (2001), because that argument was not

raised in their initial brief, so Defendants had not been able to discuss it in their response brief.  (Tr. 35-36.)

"A facial challenge, as distinguished from an as-applied challenge, seeks to invalidate a statute or regulation itself." *United States v. Frandsen*, 212 F.3d 1231, 1235 (11th Cir. 2000). UEC's reply brief argues that it seeks to invalidate the entire transition provision at 36 C.F.R. § 219.35.  In challenging the entire transition regulation - including those parts of the regulation that were inapplicable to the decision at issue in this case - UEC's argument constitutes a facial challenge.  As explained above, this court acts as an appellate court in this case, *see Olenhouse*, 42 F.3d at 1580, and the Tenth Circuit has explained that arguments raised for the first time in a reply brief are waived, *see Stump v. Gates*, 211 F.3d 527, 533 (10th Cir. 2000).

It is possible to construe UEC's brief as vaguely raising a facial challenge to the 2000 transition provision.  UEC argued in that brief that "the 2000 transition provision is illegal and cannot be applied" and that "[t]he transition provision provides none of" the specific requirements mandated by 16 U.S.C. § 1604(c); however, this argument was not clearly raised, could not be identified by Defendants with any certainty, and certainly was not adequately briefed.  UEC explained neither that it was making a facial challenge to the regulation, nor that it was challenging the entire regulation.  Such vaguely raised and inadequately

40

briefed arguments need not be addressed by the court in its decision, nor by the opposing party in its response brief.  *See Merrifield v. Board of Cnty. Comm'rs*, – F.3d –, 2011 WL 3000687, *5 (10th Cir. 2011) (declining to address argument that was not raised in opening brief but was raised later at oral argument); *U.S. v. Waseta*, 647 F.3d 980, 989 n.6 (10th Cir. 2011) (refusing to address argument developed for first time in reply brief); *Bronson v. Swensen*, 500 F.3d 1099, 1104 (10th Cir. 2007) ("[W]e routinely have declined to consider arguments that are not raised, or are inadequately presented, in an appellant's opening brief.")  The federal rules require that arguments be clearly identifiable and well-briefed in order to be addressed on appeal. UEC's vague and extremely brief alleged facial challenge did not meet either of those requirements.  As a result, the court deems UEC's facial challenge as waived.[10]  *See U.S. v. Cooper*, – F.3d –, 2011 WL 3559929, at *19 (10th Cir. 2011) ("It is well-settled that '[a]rguments inadequately briefed in the opening brief are waived.'" (citations omitted)).

UEC's other challenge to 36 C.F.R. § 219.35 (2001) was an as-applied challenge, and asserted that the portion of 36 C.F.R. § 219.35(a) (2001), that requires the Forest Service to "consider the best available science in implementing" a forest plan violates 16 U.S.C. § 1604(g).  The court has reviewed this

---

[10]Indeed, confusion as to what argument UEC intended to make is probative of inadequate briefing.

argument and agrees with Defendants' counter-argument that section 1613 - not section 1604 - governs rules "implementing" a forest plan, and that section 1613, unlike section 1604, does not require that certain topics be addressed.

When Congress expressly delegates authority to an agency to promulgate regulations, "any ensuing regulation is binding in the courts unless procedurally defective, arbitrary or capricious in substance, or manifestly contrary to the statute." *United States v. Mead Corp.*, 533 U.S. 218, 227 (2001) (citing *Chevron U.S.A., Inc. v. Natural Res. Def. Council*, 467 U.S. 837, 844 (1984)). Section 1604(g) authorizes the Secretary to promulgate regulations "for development and revision of [forest plans]" and requires those planning regulations to address certain topics, *see* 16 U.S.C. § 1604(g)(1)-(3); however, "implementing" a forest plan is not the same as the "development and revision" of a forest plan.  Under NFMA, Congress established a two-step process for managing the national forests.  First, "NFMA requires the Forest Service to develop and maintain a Forest Plan for each unit of the National Forest System." *Native Ecosystems Council v. U.S. Forest Serv.*, 418 F.3d 953, 957 n.1 (9th Cir. 2005). Second, after the forest plan is established, "the Forest Service implements each Forest Plan by approving or disapproving site-specific actions." *Id.*  Thus, "development and revision" of a forest plan is a different management activity than *implementing* a forest plan.  16 U.S.C. § 1604(g).

Given that "implementing" a forest plan is a different management activity than developing or amending a forest plan, section 1604(g) does not apply to 36 C.F.R. § 235.19(a), which regulates the implementation of an existing forest plan.  By its terms, section 1604(g) applies only to regulations that govern "development and revision" of forest plans.  16 U.S.C. § 1604(g).  The 36 C.F.R. § 235.19(a) provision that UEC challenges here requires the Forest Service to consider the best available science in "implementing" a forest plan.  Therefore, section 1604(g) does not apply to 36 C.F.R. § 235.19(a) (2001).

Thus, where, as here, the Secretary has promulgated regulations that implement an existing forest plan, those regulations are authorized under 16 U.S.C. § 1613.  Section 1613 allows the Secretary to promulgate "such regulations as he determines necessary and desirable to carry out the provisions of [NFMA]." 16 U.S.C. § 1613.  Section 1613 does not require regulations promulgated thereunder to address certain topics.  As a result, the court concludes that the 36 C.F.R. § 235.19(a) (2001) provision requiring the Forest Service to "consider the best available science in implementing" a forest plan need not comply with 16 U.S.C. § 1604(g); therefore, UEC's argument lacks merit.

UEC also argues that because the DN/FONSI has one citation to the enjoined 2005 regulations, the entire decision is arbitrary and capricious.  The court rejects this argument.  The

43

record shows that the DNF applied the "best available science" standard of 36 C.F.R. § 235.19(a) (2001).  The EA mentions the "best available science" standard at least sixteen times (AR 14056, 14058, 14060, 14062, 14065, 14069, 14074, 14075, 14078, 14089, 14090), and the DN/FONSI itself states that the 2005 regulations were enjoined and that 36 C.F.R. § 235.19(a) (2001) applied (AR 13987).  The court concludes that one citation to the 2005 regulations is not enough to prove the EA relied upon those regulations rather than 36 C.F.R. § 219.35(a) (2001), particularly in light of the EA's history, including the withdrawal of the February 23, 2007 EA and the later June 15, 2007 reissuance, which was done to comply with the Forest Service's directive after the 2005 regulations were enjoined (AR 13885, 15394-402).  *Cf. Utah Envtl. Cong.*, 518 F.3d at 830 (explaining that although the Forest Service did not specifically cite the 2000 regulation in its DN, the administrative record established that the agency considered the best available science, and the DN explicitly referenced the Goshawk Amendment, which bound the Forest Service to consider the best available science by its incorporation of the Conservation Strategy).

Finally, UEC also claims the 1982 regulations should apply instead of 36 C.F.R. 219.35(a) (2001); however, the Tenth Circuit has held that 36 C.F.R. § 219.35(a) "rendered the 1982 rule inoperative for project-specific decisions made after November 9, 2000." *Utah Envtl. Cong.*, 443 F.3d at 746.  Thus, UEC's

44

contention that the 1982 regulations apply to this case lacks merit.

### 4.  Complaince with the DNF's Plan and NFMA

Finally, the court turns to UEC's fourth main argument that the DNF failed to accurately monitor and/or provide for sustainable diversity and population viability as required by NFMA and the DNF's Plan.  Specifically, UEC argues that the DNF did not comply with NFMA and the DNF's Plan's guidance for the wild turkey, aquatic macroinvertebrates, the northern goshawk, and the three-toed woodpecker.

As explained above, the court reviews compliance with NFMA under the APA, *see Utah Envtl. Cong.*, 443 F.3d at 739, and under the APA, "[a] presumption of validity attaches to the agency action and the burden of proof rests with the appellants who challenge such action," *Citizens Comm. to Save Our Canyons*, 513 F.3d at 1176 (citations and quotation omitted).  In order to meet its burden and overcome the presumption in favor of the agency under the APA, UEC must show that the DNF's decision was "arbitrary and capricious, an abuse of discretion, or otherwise not in accordance with law."  *Utah Envtl. Cong.*, 443 F.3d at 739.  To prove that the DNF's decision was "arbitrary and capricious," UEC must show that the decision fails to comply with the DNF Plan.  *See* 16 U.S.C. § 1604(i).  The court must give the DNF's interpretation of its plan "controlling weight" unless the interpretation is "plainly erroneous or inconsistent with the

45

regulation[s]." *Lamb v. Thompson*, 265 F.3d 1038, 1047 (10th Cir. 2001) (quotations and citations omitted, alteration in original).

To ensure the viability of species, forests have adopted Management Indicator Species ("MIS").  MIS are species of animals or plants that are chosen by the forest to act as a sort of bellwether.  *See Utah Envtl. Cong. v. Bosworth*, 372 F.3d 1219, 1227 (10th Cir. 2004).  MIS represent species dependent on specific habitats, and the Forest Service monitors the MIS as a way to gauge the health of the larger community of species dependent on each of those habitat types.  Under the DNF Plan, minimally viable populations of all MIS are to be exceeded through planning in all projects.  (Doc. 15, at 41 (citing Dixie Forest Plan FEIS S-10).)

The Forest Service also has designated certain species as "sensitive species."  Sensitive species are Forest Service-designated species whose population viability is a concern either because of a significant current or predicted downward trend in population or habitat capability.  (Doc. 15, at 46 (citing Forest Service Manual ("FSM") 2670.5).)  The FSM directs forests to ensure that sensitive species do not become threatened or endangered because of Forest Service actions and to determine the distribution, status, and trend of sensitive species and their habitats and to maintain viable populations in their habitats. (*Id.* (citing FSM 2670.45(4), 2670.22).)  Regarding sensitive

species, the DNF Plan simply says, "Habitat will be improved for sensitive species."  (AR 1082.)

UEC argues that although the Mt. Dutton Project will directly affect wildlife habitats and the species dependent upon them, the DNF failed to accurately monitor and/or provide for sustainable diversity and population viability in terms of four MIS/and or sensitive species: (1) the wild turkey, (2) aquatic macroinvertebrates, (3) the northern goshawk, and (4) the three-toed woodpecker.

### a.  The Wild Turkey

First, the wild turkey is a DNF MIS representing the habitat of mountain brush, mature aspen, and mature-old growth conifer. The DNF Plan requires (1) annual monitoring of wild turkeys (AR 1226) and (2) maintaining wild turkey habitat (AR 1013).  Having examined the pleadings and the record, the court is persuaded that the DNF adequately monitored and maintained the wild turkey population.

First, the DNF adequately monitored the wild turkey population.  Even if the Forest Service does not annually collect data on a species as required by a forest plan, courts will uphold the Forest Service's decision if the Forest Service collected population data that is "ample to support" its decision, *Utah Envtl. Cong.*, 443 F.3d at 751-52; *see also Utah Envtl. Cong.*, 479 F.3d at 1285 (stating that the Forest Service must make a "good faith effort" to collect population data), and

47

the court concludes that the DNF collected ample data on wild
turkeys to support its decision.  For example, the record
contains monitoring data for 1992, 1995, 1997-2001, 2005, and
2007.  (AR 7186, 7208, 7209-17, 7218-36, 7166-85, 7187-206, 8078,
8083, 8092, 8095, 8098, 8114, 8136, 11519-36, 11547, 11553,
11614, 11693, 11696, 11700-06, 11708-11.)  Additionally, the DNF
relied on a Life History Report for the wild turkey.  (AR 11984-
86.)  Such reports satisfy the DNF's monitoring requirements.
*See Utah Envtl. Cong.*, 443 F.3d at 751 (stating that life history
report satifies Forest Service's monitoring obligations under the
forest plan).  Further, the DNF monitored the wild turkey in and
near the Mt. Dutton Project area.  (AR 7186, 7208, 7207 (video),
8073-77, 8139.)  The DNF had sufficient data on wild turkey to
render a reasoned decision.

Second, the DNF has maintained wild turkey habitat.  Data in
the record shows that wild turkey populations consistently have
been on the rise.  Citing to AR 7167, 7187, Defendants represent
that the number of turkey hunting permits issued by the Utah
Division of Wildlife Resources has been increased every year;
further, the record provides that "turkeys have been hard to
count because of [an] increased population trend" (AR 8294).  The
DNF observed:

> Since 1997[,] hunter success rates have been
> on the increase from a total of 80 birds to
> 120 birds in a 3-year period.  In combination
> with these numbers, the total numbers of
> hunter days in the field to harvest a bird

> have dropped drastically.  This suggests that
> birds are more prevalent to harvest in a
> shorter time period.  Since 1991[,] the total
> numbers of Rio Grand turkeys harvested have
> also increased steadily.  Based on these
> data, turkey populations are increasing, or
> are in an upward trend, and therefore
> populations are viable in the Southern
> Region.

(AR 11986.)  Consistent with these observations, the wild turkey
population within the Mount Dutton area itself is estimated to be
300, and the Mount Dutton unit comprises only two of the six
hunting units on the DNF.  (AR 7208.)  These positive
observations show that the DNF has maintained wild turkey habitat
consistent with the DNF Plan.

Moreover, the DNF's extensive monitoring data shows that its
approved action will not harm the wild turkey or its habitat in
the DNF.  Instead, the DNF determined that the approved project
actually would improve the wild turkeys' foraging habitat.  (AR
14044.)

Also, in attempting to show that the wild turkey population
is below 150 turkeys, UEC misstates the Administrative Record:
UEC states that "the wild turkey population went from 80 in 1997
to 120 three years later" (Doc. 15, at 43); however, as shown
above, the numbers 80 and 120 represent the number of wild
turkeys that were successfully hunted, not the total population
of wild turkeys (AR 11986).

**b.  Aquatic Macroinvertebrates**

Second, aquatic macroinvertebrates are a Dixie National Forest MIS that reflect the condition of the aquatic community. UEC argues that "[i]n order to ensure viability of macroinvertebrates, the Forest Plan requires the DNF to maintain a Biotic Condition Index ('BCI') of at least 70" (Doc. 15, at 44 (citing AR 1013)), that "[s]ome streams within the effects area are currently below the Forest Plan standard of 70" (*id.* at 45), and that "Mt. Dutton Project activities will most likely further reduce BCI counts below Forest Plan minimum standards" (*id.*).  In other words, UEC argues that "[t]his violation of a Forest Plan requirement for macroinvertebrates coupled with actions that will most likely drop BCI levels even lower is a violation of the Forest Plan and NFMA's guidance to ensure the viability of species" (*id.*).

The court finds UEC's argument unpersuasive.  The DNF Plan reveals that the purpose of using BCI is not to maintain populations of macroinvertebrates themselves, but to maintain appropriate habitat for fish populations.  The DNF Plan provides:

> <u>Aquatic Habitat Indicators</u>.  Because of the variety of aquatic habitats on the Forest, a combination of Indicator Species will be used.  The native Bonneville cutthroat trout will be the MIS in those streams which contain native or transplanted populations. Rainbow, brown, brook, or cutthroat trout will be used in most streams and lakes on the Forest.  The most common species in a particular water body will be the MIS in that area.  If fish population data is not

> available for a particular water body, the
> macroinvertebrate biotic condition index
> (BCI)* will be used to assess fish habitat
> capability.

(AR 1014.)  Because of that stated intention, Judge Cassell

explained in *Utah Envtl. Cong. v. Troyer*, 1:04-cv-155-PC, Doc.

44, at 21 (D. Utah July 6, 2005), *aff'd*, 479 F.3d 1269 (10th Cir.

2007), that the DNF Plan does not require the DNF to monitor

aquatic macroinvertebrates where, as here, it is undisputed no

fish reside in the streams.  *See id.* ("The Forest Plan discusses

macroinvertebrates as an alternative aquatic habitat indicator

for assessing 'fish habitat capability' where fish population

data is not available for a particular body of water.  The record

does not indicate that any body of water in the Dark Valley

project provides fish habitat, and thus, there was no obligation

to consider any fish habitat indicator, including

macroinvertebrates, before approving the Dark Valley Vegetation

Management Project."  (footnote omitted)).

     UEC conceded in its oral argument that there are no fish in

the project area streams.  (Tr. 13.)  Thus, in accordance with

Judge Cassell's decision in *Troyer*, the DNF Plan does not require

the DNF to monitor macroinvertebrates in the project area

streams.

     Further, the approved action does not implicate a species'

viability; therefore, the DNF has complied with its plan.  *See*

*Utah Envtl. Cong. v. Bosworth*, 370 F. Supp. 2d 1157, 1172 (D.

Utah 2005), *aff'd Utah Envtl. Cong.*, 443 F.3d at 744.  The DNF
has imposed mitigation measures to prevent any effects on the
aquatic habitat.  For example, the DNF has prohibited any
mechanized timber harvesting within 150 feet of streams in the
project area (AR 14022).  This restriction will reduce sediment
that may enter the streams; further, because the dead trees do
not currently provide shade, removing them by hand or helicopter
along the banks of streams will not adversely affect shade and
water temperature.  (AR 4067, 14064.)  Also, the DNF has
prohibited prescribed burn activities within 100 feet of streams,
reducing the ash that may enter the aquatic habitat.  (AR 14022,
14063, 14076.)  The DNF concluded that with these mitigation
measures, "implementation of either action alternative would not
result in detrimental impacts to aquatic biota populations or
habitat, beyond the current trend and condition of the area."[11]
(AR 3528.)  Also, because the record establishes there are no
fish populations within 8 miles of the project area (AR 3521-22),
there is no connection between the project and any potential harm
to fisheries (AR 3526-27).  Thus, no nexus exists between the

---

[11]Defense counsel explained at oral argument regarding the
mitigation measures:
> We are not destroying or doing anything to
> the rivers and streams themselves, all we are
> saying is the way we're going to construct
> the project is it won't interfere with these
> streams . . . we are going to develop around
> them and act in such a way that it is not
> going to harm them.

(Tr. at 32.)

project and measurable effects to aquatic macroinvertebrates or
aquatic habitat.  The DNF concluded that "implementation of
either action alternative would not result in detrimental impacts
to aquatic biota populations or habitat, beyond the current trend
and condition of the area."  (AR 3528.)

UEC cites to a summary of a literature review in the record
in an effort to refute the DNF's site-specific analysis.  That
review was conducted by DNF personnel on the effects of fire on
aquatic habitat in the southwestern United States.  (AR 3726.)
The review does not provide any site-specific analysis as to
Defendants or the project area.  Moreover, the literature review
did not consider the mitigation measures of having 100-foot
buffer zones for prescribed burns and 150-foot buffer zones for
mechanized timber-harvesting.  Therefore, UEC's citation to the
literature review does not refute the DNF's site-specific
analysis.[12]

As a result, the court concludes the UEC's argument
regarding aquatic microinvertebrates does not establish that the
DNF's decision was arbitrary and capricious, an abuse of
discretion, or otherwise not in accordance with law.

---

[12]Further, citing to AR 3545, 3554, 3548, 3563, 3566, 3569,
3572, 3575, 3578, 3581, 3564, 3585, 3643, and 3726, Defendants
point out that numerous surveys show that the DNF actually met or
exceeded 70 BCI for aquatic macroinvertebrates in the DNF.

### c.  Northern Goshawk

Third, UEC argues that the DNF failed to provide the required protection for the northern goshawk, which, according to UEC, is both an MIS and a DNF sensitive species.  (Doc. 15, at 46.)  UEC argues that the project area contains goshawk habitat which, according to the Wildlife Report, will be impacted by the project for 25-30 years. (Doc. 15, at 47 (citing AR 6292).)  Also, UEC points out that the record provides that "[f]oraging individuals may not use the area during treatments and are likely to disperse to other areas to forage within and adjacent to the project area.  However, this would be a short term (2-5 years) effect until the proposed activities are finished."  (*Id.*)  UEC argues that based on the project's effects to the goshawk's habitat and to "foraging individuals," the proposed project "will further degrade the habitat of this sensitive species violat[ing] the Forest Plan Goshawk Amendment and the Forest Service Manual direction on sensitive species."  (Doc. 15, at 47-48.)

The court has reviewed the record and pleadings and is unpersuaded by UEC's argument.  As Defendants point out, there are no known goshawks within the project area (AR 6259), the DNF was unable to either locate any goshawk nests or observe any in the project area (AR 6259), and UEC has failed to cite any evidence to the contrary.  It strains credulity to argue the project will affect the goshawks when there are none in the area.

Nevertheless, the DNF did determine the project area may
serve as suitable goshawk nesting habitat because the project
area could support both goshawks and their prey (AR 6259);
however, much of the northern goshawks' prey has left the project
area to find more favorable living conditions because the spruce
beetle epidemic destroyed hundreds of acres of trees on which the
northern goshawks' prey relies (AR 6260, 14041, 14072).  As a
result, the project area no longer serves as suitable goshawk
nesting or foraging habitat.  (AR 6291.)

Given these conditions, the DNF designed the approved
project to improve goshawk habitat while reducing the risk of
catastrophic fire, which would further destroy goshawk habitat.
To accomplish these objectives, the DNF required that the project
maintain "300 snags per 100 acres in the spruce-fir cover type
and 200 snags per 100 acres in the aspen cover type," in
compliance with the Guidelines in the Utah Northern Goshawk
Amendment to the Forest Plan.  (AR 14023.)  Further, the DNF
required that the project "provide for the needs of a wide
variety of wildlife, an average of 100 tons per 10 acres of woody
debris in the spruce-fir cover type and 30 tons per 10 acres in
the aspen cover type would be retained following the guidelines
outlined in the Utah Northern Goshawk Amendment to the Dixie
Forest Plan."  (Id.)  Also, the project would aim for a goal of
150 live trees per acre and would distribute trees within the
project area to provide for quality goshawk foraging habitat. (AR

6291.)  The DNF also stated that if goshawk nests are found
within the project area during the project, then it would follow
the relevant protocols in the Utah Northern Goshawk Amendment to
the Dixie Forest Plan.  (AR 14023.)  Based on this analysis, the
DNF determined that the project would benefit goshawk habitat.
(AR 6291.)

     Despite the DNF's analysis, UEC claims that the project will
cause short-term degradation to goshawk habitat and, therefore,
the project fails to comply with the DNF Plan.  UEC claims that
goshawk habitat impermissibly will be affected in the short-term
because 293 acres of aspen habitat will be treated during the
DNF's approved project.  (Doc. 15, at 47.)  UEC fails to mention
that the DNF expressly found that treating the 293 acres of aspen
will improve aspen habitat, which will greatly benefit the
goshawk in the long term.  (AR 6292.)  Further, instead of
contradicting the findings of the "Management Recommendations for
the Northern Goshawk in the Southwestern United States," as UEC
suggests, the treatment of aspen habitat follows those findings.
Those management recommendations were "designed to produce forest
conditions that will sustain goshawk populations by minimizing
long-term loss of their habitat due to unfavorable environmental
conditions . . . ."  (AR 11333 (in Reynold's Report)), and the
record supports that the proposed project will make long term
improvements to the goshawk habitat (AR 6292).  Therefore, the

court concludes that UEC has not shown the DNF has not complied
with its plan regarding the northern goshawk.

### d. Three-toed Woodpecker

Finally, UEC argues the DNF also failed to provide the
required protection for the three-toed woodpecker, another
sensitive species; having examined the arguments and record, the
court is persuaded the DNF complied with its plan and NFMA as to
the three-toed woodpecker.  As with the northern goshawk, the
DNF's surveys revealed that no three-toed woodpeckers were within
the project area, and that the project area contains only a small
portion of suitable habitat for the woodpecker.  (AR 6261.)

In addition, to maintain the suitable habitat that exists in
the project area, the DNF designed the project to leave a minumum
of 300 snags per 100 acres greater than eighteen inches in
diameter.  (AR 14042, 14052.)  Also, the DNF determined that
closing and decommissioning roads improves three-toed woodpecker
habitat by reducing human access to it.  (AR 6293, 6296.)

UEC asserts that the DNF did not comply with its plan
because it lacks information on the woodpecker.  The court
rejects this argument because the DNF made a good faith effort to
locate the three-toed woodpecker through surveys but did not find
any.  (AR 6261.)  The DNF is required to make a "good faith
effort" to obtain information on a particular species, and "is
not otherwise required 'to attempt to track species where no
population [thereof] exists. . . .'"  *Utah Envtl. Cong.*, 479 F.3d

at 1285 (quoting *Utah Envtl. Cong.*, 372 F.3d at 1230 (alteration in original)).  The record supports that the DNF fulfilled its obligations under the DNF Plan as to the three-toed woodpecker.  Thus, the court concludes UEC has not adequately shown the DNF did not fulfill its obligations under the DNF Plan as to the three-toed woodpecker.

In summary, the court concludes that UEC has not shown the DNF's decision was arbitrary and capricious because it did not comply with the DNF Plan.  The Forest Service examined relevant data and articulated a satisfactory explanation for its action, including articulating a rational connection between the facts found and the choices that the Forest Service made.  *See Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29, 43 (1983).

## <u>CONCLUSION</u>

Based on the above analysis, IT IS HEREBY ORDERED that UEC's request that the court reverse approval of the Mt. Dutton Project is DENIED.  UEC has not demonstrated that the approval of the Mt. Dutton Project was arbitrary and capricious, an abuse of discretion, or otherwise not in accordance with law.

Accordingly, the Clerk of the Court is directed to close this case.

DATED this 14th day of October, 2011.

BY THE COURT:

_____
SAMUEL ALBA
United States Magistrate Judge